# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE:<br><br>**RYAN WILLIAM HAWKES, and SUZANN MARGARET HAWKES,**<br><br>Debtors. | Case No. 19-00880-JDP |
| **SPRING CREEK CAPITAL, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**RYAN WILLIAM HAWKES,**<br><br>Defendant. | Adv. Proc. No. 19-06057-JDP |

# MEMORANDUM OF DECISION

### *Introduction*

Defendant Ryan Hawkes and Douglas Clegg, along with their spouses and families, were neighbors and became friends.  In January 2012, Defendant sought and received an operating loan for his business, the long-time family used car

dealership CARS Enterprises ("CARS"), from Clegg's lending and investment

company, Spring Creek Capital LLC ("Plaintiff").   Defendant's business

operation, along with the parties' friendship, eventually crashed and the loan

went unpaid, albeit only after Plaintiff had collected a generous amount of

interest on the loan over several years.   In the aftermath, Clegg became

convinced that he had been duped into foregoing collection of the loan balance

by Defendant's persuasive puffing about the financial health and performance of

CARS over the years.  With CARS defunct, and Defendant a debtor in a chapter

7[1] bankruptcy case,[2] Plaintiff filed this adversary proceeding seeking to except its

claim against Defendant from discharge for fraud under § 523(a)(2) and objecting

to Defendant's discharge under § 727(a) based upon Defendant's conduct both

before and after the bankruptcy filing.

Although the Court dismissed Plaintiff's claim that Defendant engaged in

fraud causing Plaintiff to not enforce the loan terms,[3] a two-day trial was

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] Bk. No. 19-00880-JDP filed July 31, 2019.

[3] *See* Memorandum of Decision and Order Granting Defendant's Motion to Dismiss, Dkt. Nos. 23 and 24.

conducted on Plaintiff's various objections to discharge which concluded on

December 1, 2021.  The parties then submitted post-trial briefs.  Dkt. Nos. 80, 81

& 82.  Having duly considered the record, evidence, testimony and arguments of

the parties, this Memorandum constitutes the Court's findings of fact,

conclusions of law, and decision concerning the issues in the adversary

proceeding.  Rule 7052.

### *Relevant Facts*

The material facts, as found by the Court,[4] can be briefly

summarized.

Defendant had significant experience working in the used car industry,

primarily in various roles for his family's business.  Testimony at trial established

that Defendant's parents William and Nancy Hawkes founded the company

Hawkes Enterprises and, some 23 years ago, opened a used car dealership in

Boise under the business name Hawkes Motors.  In 2010, Defendant and a

---

[4]  The credibility of the witness testimony at trial was a factor in determining the outcome in this action.  Witnesses gave very different, sometime contradictory, accounts of relevant facts and transactions and, sometimes conspicuously, attempted to "spin" the facts to support their opinions.  That the witnesses were past friends, or former spouses, whose relationships had ended badly likely impacted their perspectives and motives.  The Court's factual determinations in this Memorandum incorporate its considered conclusions about the appropriate weight and reliability to assign to the testimony of the trial witnesses.

MEMORANDUM OF DECISION - 3

business partner, Curtis Grieve, purchased Hawkes Enterprises from his parents for $250,000. Ex. No. 113. The purchase included the corporate stock, the business name ("dba") Hawkes Motors, flooring lines, bank accounts, and an inventory of 80–100 vehicles. *Id.* Hawkes Enterprises appears to have been liquidated sometime later in 2010, at which point Defendant, Grieve, and their respective spouses formed a new company, CARS.

CARS dba Hawkes Motors operated on a lot on Fairview Avenue owned by Alvin and Virginia Smart and leased to William and Nancy Hawkes. Ex. No. 210.  Importantly, the lease, which was amended three times, provided that, to be effective, any assignment of the lease must be approved by the landlord. *Id.* at 12. The third addendum to the lease, executed in December 2003, disclosed that the parties apparently intended that Defendant would, at some undetermined time, be the "successor" to his parents' interests under the lease, *see* Ex. No. 210 at 12, but no assignment was ever executed.  While Defendant operated Hawkes Motors on the lot, maintained it, and paid rent to the landlords, Defendant insists that neither he nor CARS ever formally subleased the property.[5]

---

[5]  Based upon this conclusion, Defendant explained that, in his mind, he was not required to list any interest in the Fairview lot in his schedules when he later filed for bankruptcy protection.  Despite this contention, Defendant also testified at trial that he "sublet" (Continued)

To track Hawkes Motors' inventory transactions, Defendant testified that CARS used DealerClick, an auto sales software system.  It paid DealerClick $500 each month to access the software, however, CARS lost its subscription and access to DealerClick data in April 2019 when it stopped making the monthly payments due to its financial difficulties.  While it records could again be accessed, he (and presumably, Plaintiff or the trustee) would have to pay a large fee to regain access.

Besides DealerClick, Defendant testified that CARS personnel prepared and maintained simple spreadsheets which tracked monthly inventory and sales, and that CARS utilized an accountant to track its finances each month. Defendant says CARS also retained detailed paper records of each vehicle transaction, such as the underlying sale contracts, in paper folders he called "jackets" which were provided to the accountant monthly, who compiled and prepared summaries of the information.[6]

---

the Fairview lot to three different auto dealers after Hawkes Motors lost its dealer's license in April 2019.  In doing so, Defendant presumably held some sort of interest in, or right to control, the lot.

[6]  It was noteworthy to the Court that, at trial, Defendant produced none of the financial documents created by the accountant, the jackets, nor any other documentation concerning CARS' finances or inventory transactions.  Even so, Defendant testified that he had paper records and jackets going back to 2013 in storage, and that Plaintiff's attorneys had inspected them during this litigation, something that Plaintiff did not dispute.

MEMORANDUM OF DECISION - 5

During Defendant's tenure as its manager, CARS received financing from multiple sources to operate, including Plaintiff, NextGear, AFC, and DA Capital. In January 2012, through Plaintiff, Clegg agreed to loan Defendant $300,000 with 15% interest to be repaid in three years; Defendant was obligated to make monthly interest payments until the loan matured. Ex. No. 127.  The loan terms also required Defendant to submit quarterly documentation to Plaintiff concerning how the loan funds were being used and the status of Defendant's operations.  Defendant never provided any such documents to Plaintiff and, remarkably, Plaintiff never requested them.  Instead, while contacts between them were infrequent, when they did communicate, Defendant orally assured Clegg, in general, glowing terms, that the CARS' sales were robust and its business was healthy.  While CARS operated, it made all the required monthly interest payments to Plaintiff.  As a result, though the full principal balance on the loan came due in 2015 and Defendant did not pay it, Clegg, apparently satisfied to accept the substantial continuing monthly interest payments, made no demand for payment in full.

As was common in the industry, CARS employed flooring lines of credit with NextGear and AFC to acquire vehicle inventory.  Under these

arrangements, NextGear and AFC provided funds to CARS or its suppliers to purchase vehicles to resell.  The creditor held a secured interest in the vehicles purchased by CARS with the understanding that the funds advanced, plus interest, would be repaid when CARS sold a vehicle.  However, Defendant testified that, for their own reasons, at some point in 2018 both NextGear and AFC decided they would no longer extend credit to CARS.  In approximately July 2018, both entities repossessed the CARS secured inventory, leaving CARS with few cars to sell.

CARS also received funding from DA Capital.  In May 2017, DA Capital and Defendant, as the president of CARS, executed a promissory note wherein DA Capital loaned CARS $2.8 million. Ex. No. 110. Defendant and Grieve personally guaranteed the loan.  Defendant testified that the DA Capital loan was to be used to establish a flooring line to use to acquire vehicles from a wholesaler, Brasher's Idaho Auto Auction, an entity related to DA Capital. This loan was secured by a deed of trust ("DoT") encumbering three parcels of real property:  a second, smaller car lot owned by CARS in Caldwell, Idaho (the "Caldwell Property"), Defendant's personal residence (the "Eagle Residence"), and Grieve's personal residence. Ex. No. 111. While the DoT was dated and

shows it was signed by Defendant and others in May 2017, for unknown reasons, it was not recorded until December 2017. *Id.*

The Caldwell Property had been purchased by CARS in 2015. CARS began renting out the location to another business, Los Paisanos, in May 2016. After CARS' business failed, Defendant executed a quitclaim deed on behalf of CARS transferring the Caldwell Property to DA Capital on August 1, 2019—the day *after* Defendant filed his bankruptcy petition. Ex. No. 108. Despite CARS continuing interests in the property as of the petition date, Defendant did not disclose the Caldwell Property or the Los Paisanos lease as assets of CARS in his original Schedule B. Ex. No. 100 at 13. Defendant later amended his bankruptcy schedules to include the Caldwell Property as an asset of CARS; the amended schedule made no mention of the Los Paisanos lease. Ex. 101 at 3.

As discussed above, the DoT also purported to encumber the Eagle Residence, which Defendant owned with his then wife, since divorced, Suzann Zimel. Ex. No. 111. Defendant valued the Eagle Residence at $1.2 million in his bankruptcy schedules. Ex. No. 100 at 10. Defendant also listed the DA Capital encumbrance, along with liens on the house held by Bank of America and US Bank. *Id.* at 26–27. As noted, the DoT appears to have been signed in May 2017

by both Defendant and Zimel. Ex. No. 111 at 24.  However, Zimel testified

fervently at trial that she did not sign the DoT and was not aware the document

existed until July 10, 2020, months after the bankruptcy case commenced.

Moreover, Zimel claims that, after bankruptcy, Defendant urged Zimel in a

phone conversation to tell the bankruptcy trustee she had indeed properly

signed the DoT.

CARS continued to operate sporadically with a meager inventory through

approximately July 2019.  However, CARS' profit and loss statement admitted in

evidence at trial shows that the business was suffering significant losses as early

as August 2017. Ex. No. 113.  Defendant filed his bankruptcy petition on July 31,

2019, and CARS ceased operation in August of 2019.  Later that year, and

notwithstanding the bankruptcy filing, Defendant transferred any right he had to

use the Hawkes Motors dba to Dan Burrup, who operated a business known as

Used Car Factory.  No consideration was given for this transfer.  After

bankruptcy, Defendant began working for Burrup at Used Car Factory.

### *Status of the Case*

Plaintiff commenced this adversary proceeding on October 22, 2019.  Dkt.

No. 1.  Before trial, the Court dismissed Plaintiff's § 523(a)(2) claim.  In the

MEMORANDUM OF DECISION - 9

remaining counts of its Amended Complaint, Plaintiff alleges that Defendant

should be denied discharge under § 727(a)(2), (a)(3), and (a)(4).  As noted above,

a two-day trial was conducted to address the unresolved issues.

## *Applicable Law*

Denial of discharge in a bankruptcy case, the most important vehicle

effecting debt relief, is a serious consequence for a debtor.  A party objecting to a

debtor's discharge under the provisions of § 727(a) bears the burden of proving

the factual elements required by the Code by a preponderance of the evidence. *In*

*re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (citing *Khalil v. Developers Sur. & Indem.*

*Co. (In re Khalil)*, 379 B.R. 163, 172 (9th Cir. BAP 2007)).  Because a denial of

discharge under § 727(a) is such a drastic remedy, "'[bankruptcy] courts should

construe claims under § 727 liberally in favor of the debtor.'" *Id.* (quoting *Bernard*

*v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir.1996)).

### A.    Section 727(a)(2)

Plaintiff asserts that Defendant should be denied discharge because he

made certain transfers both within the year prior to, and after, filing for

bankruptcy.  Under § 727(a)(2), a debtor will be denied discharge if:

> with intent to hinder, delay, or defraud a creditor or an officer of the
> estate charged with custody of property under this title, [debtor] has
> transferred, removed, destroyed, mutilated, or concealed, or has

MEMORANDUM OF DECISION - 10

permitted to be transferred, removed, destroyed, mutilated, or
concealed—

> (A) property of the debtor, within one year before the date of
> the filing of the petition
> (B) property of the estate, after the date of the filing of the
> petition.

To prevail on a § 727(a)(2) claim, the objector must establish (1) a disposition of property as described in the Code (2) made by a debtor with the subjective intent to hinder, delay, or defraud a creditor through the act of disposing of the property. *Heaton v. Boudreau (In re Miller)*, 2014 WL 3408028, at *3 (Bankr. D. Idaho July 10, 2014) (quoting *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010)).  The targeted transfer must be of the debtor's property under § 727(a)(2)(A), or of property of the estate under § 727(a)(2)(B).  Importantly here, "'[m]ost courts conclude that "property of the debtor" under section 727(a) does not include property of a corporation the debtor controls, unless the court should pierce the corporate veil and disregard the corporate form.'"  *Kane v. Chu (In re Chu)*, 511 B.R. 681, 685 (Bankr. D. Haw. 2014); *see also Stout v. Marshack (In re Stout)*, 649 Fed. Appx. 621 (9th Cir. 2016) ("While the transfer of assets owned by a corporation normally does not constitute a transfer by a debtor of his or her own property, property owned by a corporation may be considered a debtor's property where the corporation was the debtor's alter ego.").

MEMORANDUM OF DECISION - 11

A "transfer" for purposes of § 727(a) is defined by the Code in § 101(54) to include "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or condition, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property."

In making a property disposition, the debtor must have acted with actual fraudulent intent—constructive intent is not sufficient. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986). However, circumstantial evidence may establish the debtor's intent. *Id.* When considering the debtor's intent, courts have found the circumstances that may indicate fraudulent intent include as:

> (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer.

*In re Retz*, 606 F.3d at 1200.

**B.      Section 727(a)(3)**

Plaintiff also contends Defendant should be denied discharge under § 727(a)(3) because he "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."

To establish a § 727(a)(3) claim, Plaintiff must demonstrate through proof that (1) Defendant failed to maintain and preserve adequate records, and (2) such failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *Caneva v. Sun Cmtys. Operating Limited P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2009). Determining the adequacy of the debtor's records is a "case-specific inquiry" wherein the bankruptcy court should focus not just on the quantity, but also the quality of records. *Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 2003 WL 21981707, at *10 (Bankr. D. Idaho July 17, 2003). Further, "'under appropriate circumstances, a debtor may be denied a discharge based on his failure to keep, maintain, or preserve records belonging to a separate, but closely held corporate entity.'" *Id.* at *11 (quoting *Blanchard v. Ross (In re Ross)*, 1999 WL 10019 (Bankr. E.D. Pa. 1999).

MEMORANDUM OF DECISION - 13

The debtor has an affirmative duty to keep adequate records, and "the court, creditors, and the trustee need not undertake an independent investigation of the debtor's affairs, speculate as to the financial history or condition of the debtor, or sift through documents in order to attempt to reconstruct the debtor's financial status." *Petro Concepts, Inc. v. Mundt (In re Mundt)*, 2009 WL 5386131, at *11 (Bankr. D. Idaho Dec. 9, 2009).  However, the debtor's duty neither requires completeness in record-keeping, nor does it shift or lessen the objector's burden to establish the facts to support its § 727(a)(3) claim. It is not enough for the objector to simply claim that a debtor has not produced adequate documents. Rather, to satisfy its burden of proof, the creditor must specify what documents were requested, received, or missing. *See Depue v. Cox (In re Cox)*, 462 B.R. 746, 762 (Bankr. D. Idaho 2011) (finding that the objectors failed to meet their burden because they failed to specify what documentation was missing); *see also Olympic Coast Investment, Inc. v. Wright (In re Wright)*, 364 B.R. 51 (Bankr. D. Mont. 2007) (finding that objectors failed to meet their burden under § 727(a)(3) when, although they had been given access to 15 file cabinets of the debtor's records, they failed to explain what was lacking in the records or to provide expert testimony explaining the inadequacy of records).

MEMORANDUM OF DECISION - 14

If an objector succeeds in establishing a prima facie case, the burden shifts

to the debtor to justify any failure to keep adequate records. When considering

whether the debtor was justified, the bankruptcy court should consider the

totality of the circumstances, including such factors as:

> (1) [the debtor's] intelligence and educational background; (2) [the debtor's] experience in business matters; (3) the extent of [the debtor's] involvement in the businesses for which discharge is sought; (4) [the debtor's] reliance on [the other party] to keep records, including what, if anything, [the debtor] saw or was told that indicated [the other party] was keeping records; (5) the nature of the marital relationship; and (6) any recordkeeping or inquiry duties imposed upon [the debtor] by state law.

*Adams v. McKay (In re McKay)*, 504 B.R. 649, 656 (Bankr. D. Idaho 2014) (quoting

*Cox v. Lansdowne ("Cox I")*, 904 F.2d 1399, 1404 n. 5 (9th Cir. 1990)).

### C.    Section 727(a)(4)

Finally, Plaintiff alleges Defendant should be denied a discharge pursuant

to § 727(a)(4)(A).  To prevail, Plaintiff must prove: "(1) the debtor made a false

oath in connection with case; (2) the oath related to a material fact; (3) the oath

was made knowingly; and (4) the oath was made fraudulently."  *Roberts v. Erhard*

*(In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005).  A false oath may include

either a false statement, or an omission on the debtor's schedules. *Id.*

MEMORANDUM OF DECISION - 15

As noted, an actionable false oath must relate to a material fact.  In the

Ninth Circuit, "materiality" for these purposes is construed broadly, holding that

a statement is material if "'it bears a relationship to the debtor's business

transactions or estates, or concerns the discovery of assets, business dealings, or

the existence and disposition of the debtor's property.'"  *In re Roberts*, 331 B.R. at

883 (quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th

Cir. BAP 1999)).

Section 727(a)(4)(A) also requires that the debtor make the false oath

knowingly.  "A debtor 'acts knowingly if he or she acts deliberately and

consciously.'"  *Khalil v. Developers Surety and Indemnity Co. (In re Khalil)*, 379 B.R.

163, 173 (9th Cir. BAP 2007) (quoting *In re Roberts*, 331 B.R. at 883).  While

recklessness cannot satisfy this intent element, "a [bankruptcy] court may 'find

the requisite intent where there has been a pattern of falsity or from a debtor's

reckless indifference to or disregard of the truth.'"  *Id.* at 174 (quoting *Wills*, 243

B.R. at 64).  The false oath must also have been made fraudulently.  Fraud under

§ 727(a)(4)(A) is similar to common law in that the objector must prove that: (1)

the debtor made a representation; (2) that he/she knew was false; and (3) made

with intention and purpose of deceiving creditors; (4) creditors relied on such

representation; and (5) that creditors sustained loss and damage as a proximate

result. *In re Roberts*, 331 B.R. at 885; *In re Retz*, 606 F.3d at 1198–99.

### *Arguments of the Parties, Analysis and Disposition of Issues*

### A.    Section 727(a)(2)(A) and (B)

Plaintiff argues that Defendant made transfers to DA Capital via his

execution of the DoT on the Caldwell property and the Eagle Residence which

support denying his discharge under § 727(a)(2)(A). [7]   However, Plaintiff's claim

is flawed.

The DoT to DA Capital encumbering the Caldwell property cannot serve

as the basis to deny discharge under § 727(a)(2)(A).  Defendant did not own the

Caldwell Property—CARS did.  Defendant did not grant DA Capital a lien –

CARS did.  As noted by the Ninth Circuit, the transfer of property by an entity,

such as an LLC, owned by a debtor does not qualify as a transfer of the debtor's

---

[7] Defendant correctly points out that Plaintiff has not properly raised these claims prior to trial.  While Plaintiff's Amended Complaint, Count II, states its § 727(a)(2) and (B) claims, the complaint does not identify Defendant's execution of the DoT as a transaction justifying denial of discharge; it instead targets Defendant's transfer of CARS vehicle inventory to secured creditors before bankruptcy and Defendant's post-bankruptcy deed conveying the Eagle Residence to DA Capital.  Plaintiff's shift of focus to the DoT transaction as a basis to deny discharge was not raised by Defendant until during trial and in post-trial briefing. This is inappropriate, and Defendant was likely prejudiced by this approach.  *See In re Kimmes*, 2014 WL 523935, at *8 (Bankr. D. Idaho Feb. 10, 2014). However, because Plaintiff's tardy theory lacks merit anyway, the Court declines to rely solely upon this argument to reject it.

property under § 727(a)(2) unless there is a showing made by the discharge

objector that the entity was the debtor's alter ego.  *In re Stout,* 649 Fed. Appx. at

623.  While Defendant certainly managed and controlled CARS, he was not its

sole owner, nor has Plaintiff alleged, argued, or offered adequate evidence to

prove that CARS was Defendant's alter ego.  As a result, the execution of the

DoT by Defendant on behalf of CARS on the Caldwell property is not a proper

basis to deny Defendant's discharge under § 727(a)(2)(A).

There is another fundamental problem with Plaintiff's § 727(a)(2)(A) claim

that Defendant's execution of the DoT in favor of DA Capital supports a denial of

discharge. The evidence showed that Debtor signed the DoT on May 25, 2017,

and that it was recorded on December 27, 2017.  Because Defendant did not file

his bankruptcy petition until July 31, 2019, both the signing and recording of the

DoT fall outside the critical one-year time frame of § 727(a)(2)(A).  Plaintiff seeks

to avoid this defect in proof by insisting that the doctrine of "continuing

concealment" applies under these facts to effectively delay the timing of the

transfer because after he executed the DoT on the Caldwell Property and Eagle

Residence, Defendant continued to occupy both properties and live in the house

and otherwise retained all benefits from the property.  Plaintiff argues that

MEMORANDUM OF DECISION - 18

because there were no outward indications that DA Captial had lien on the properties until the bankruptcy case was filed, the transfers are not subject to the two-year limit.

The Court is not persuaded. Defendant's "continuing concealment" argument is inapt under these facts. As between debtor and creditor, the transfer of the lien on the car lot and house was effectively made when the DoT was signed and delivered the DoT to DA Capital in May 2017. That Defendant continued to occupy and use the business premises and the house and to "enjoy" their benefits was not inconsistent with his having granted a lien to the creditor to secure repayment of the corporate debt. Put another way, that real property has been encumbered is not inconsistent with a debtor-owner's occupation or use of the property. Here, the evidence does not establish that Defendant engaged in any efforts to actively conceal from others that the DoT existed, and the proof is inconclusive that he prevented its recording until 2019. Under these facts, Plaintiff has not shown that the transfer from Defendant to DA Capital via the DoT occurred within one year before the bankruptcy case was filed.

Moreover, even if Defendant's transfer to DA Capital via the DoT otherwise qualifies for purposes of § 727(a)(2)(A), the Court is unpersuaded that

the grant of the lien to the creditor by Defendant was made with any subjective intent to hinder, delay, or defraud any of Defendant's other creditors.  The DoT was granted to DA Capital by Defendant in connection with CARS' efforts to secure a much-needed credit to free up vehicle inventory from other liens and acquire new stock for CARS.  That the transfer of the DoT occurred while CARS was experiencing financial stress, perhaps even insolvent, or that Defendant and DA Capital's principal were long-time acquaintances and business associates does not, in the Court's opinion, circumstantially render the transaction fraudulent.  The possible existence of other supposed "badges of fraud" urged by Plaintiff also do not persuade the Court to find that Defendant acted with bad intent in connection with the DA Capital DoT in this case.

Plaintiff next argues that Defendant should be denied a discharge under § 727(a)(2)(B) for having made transfers of property of the estate after filing the bankruptcy petition.  This argument targets Defendant's execution of the August 1, 2019, quitclaim deed to DA Capital on the Caldwell Property and, also, his post-bankruptcy transfer of the right to use the Hawkes Motors dba, or business name, to Dan Burrup.

Defendant argues that the Caldwell Property was not property of the estate, as it was owned by CARS, not Defendant.  Defendant's position is the correct one.  As noted above, Defendant and CARS were distinct legal entities.  Therefore, Defendant's act of deeding the Caldwell property to DA Capital the day after filing his bankruptcy petition did not constitute a transfer of property of the bankruptcy estate.

Plaintiff's proof also fails to show that Defendant's transfer of the dba to Burrup was fraudulent.  Defendant, along with Curtis Grieve, purchased Hawkes Enterprises in 2010 for $250,000.  This purchase included the stock, 80-100 vehicles in inventory, a flooring line, and the Hawkes Motors dba. Plaintiff complains that, after filing for bankruptcy, Defendant transferred the Hawkes Motors dba to Dan Burrup, the owner and his new boss at the Used Car Factory.  Defendant counters Plaintiff's contention that the business name was worth a significant amount by pointing out that when Defendant purchased Hawkes Enterprises, the $250,000 was not only for the dba, but also for stock, flooring lines, and a considerable amount of inventory.

The Court concludes, on this evidentiary record, it is simply too speculative to assume that Defendant's act of signing over the Hawkes

Enterprises dba to Burrup was of such a character or significance to justify a

denial of Defendant's discharge.   While Defendant received no significant

monetary consideration for this transaction, the proof in the record is inadequate

to show that the dba had any significant value as to render this transfer

sanctionable.  By the time it occurred, Hawkes Enterprises, as a business, was

effectively defunct with the bulk of its assets dissipated or seized by creditors.  It

is questionable if the dba was worth anything.  While Plaintiff contends

otherwise, to the Court, the original purchase price Hawkes Enterprises assets is

of little relevance since that price allowed Defendant and Grieve to acquire all

Hawkes Enterprises assets and operations, not just the company's moniker.

Defendant's "transfer" of the dba to his employer Burrup was at most an

accommodation to him to save him the inconvenience of having to reregister it in

his own name.  Notably, Burrup apparently did not thereafter do any significant

business as Hawkes Motors.

Finally, again, even if the post-bankruptcy transfers targeted by Plaintiff

could support a discharge denial under § 727(a)(2)(B), there is insufficient proof

that they were made by Defendant to Burrup with the sort of intent required by

the Code to be culpable.  As opposed to acting fraudulently, Defendant was

MEMORANDUM OF DECISION - 22

more probably attempting to salvage what he could from the financial mess he

was experiencing.  Having failed to prove that the transfers were fraudulently

made, Plaintiff's claim fails.

### B.     Section 727(a)(3)

Next, Plaintiff contends that Defendant should be denied a discharge

under § 727(a)(3) because he failed to properly keep and preserve the business

records of Hawkes Enterprises and CARS.   As noted above, under certain

circumstances, a denial of discharge might be appropriate when a debtor fails to

maintain records for a separate, but closely held entity. *Thomas*, 2003 WL

21981707 at *11.   Plaintiff contends that, after bankruptcy, at its request,

Defendant produced no records other than some bank account statements to

allow Plaintiff to properly scrutinize CARS' and Defendant's financial dealings.

In his defense, while he did not physically offer them in evidence, Defendant

testified about the existence of "inventory lists, sales records, balance sheets,

general ledgers, quarterly reports, loan balance sheets, and flooring line records."

These included the car sales jackets and the accountant compilations.  Plaintiff

contends that Defendant, to be entitled to a discharge, should not be able to reply

upon generic oral testimony as a substitute for actually producing the

documents.

MEMORANDUM OF DECISION - 23

The Court is at a loss as to why, as a tactical matter, Defendant or his counsel did not simply bring at least some of the financial records he talked about to the trial.  Even so, Plaintiff bears the burden of proof on this claim, and its argument fails to distinguish between a debtor's duty, under § 727(a)(3), to "keep and preserve" records, and any obligation to "produce" those records at trial.  Importantly, Defendant's unrefuted testimony showed that a substantial collection of physical financial documents from CARS were indeed kept and preserved.  It is undisputed that a portion of these documents, at least, were securely stored and made available to Plaintiff's counsel to review before trial, albeit it appears they were in considerable disarray.  Defendant testified without contradiction that Plaintiff's attorneys inspected a substantial number of boxes of documents.  Plaintiff did not effectively counter this testimony.

Contrary to its arguments, although the financial records were not offered into evidence by Defendant at trial, and while the information Defendant provided to Plaintiff may have been disorganized, this did not prove that, from a more comprehensive review of the documents, Defendant's financial dealings could not be ascertained.  Moreover, as Defendant pointed out without contradiction, much of CARS' business information was stored electronically via

a servicer, DealerClick.  It was the DealerClick software that was used daily to

track CARS' inventory transactions.  When CARS financially failed, the monthly

fees monthly fees charged by DealerClick allowing access to this information

went unpaid.   Defendant testified, and the Court accepts as true, that, after his

bankruptcy filing, Defendant was not able to pay the $5,000 fee needed to

reactivate access to DealerClick.  Apparently, Plaintiff was not inclined to

advance this sum to access these records to test Defendant's account of their

completeness and accuracy.

Plaintiff also complains that while Defendant testified that CARS

prepared, and an accountant processed, monthly financial reports and

information about the business dealings, that Defendant failed to produce any of

them at trial.  However, again, Defendant's failure to produce such records at

trial does not satisfy Plaintiff's burden to show the records were not in fact

"kept" or "preserved."  While Defendant's response to Plaintiff's requests for

business records appears to have been somewhat cavalier, given the stakes in

this litigation, the Court declines to find that Defendant's discharge should be denied under § 727(a)(3) on this record.[8]

## C.    Section 727(a)(4)

Plaintiff contends that Debtor made multiple false oaths in connection with the case—any of which support the denial of discharge under § 727(a)(4).  These include: (1) Defendant's representation in Item 19 on Schedule A/B of the bankruptcy schedules that CARS had no assets; (2) statements on Schedule H that CARS was no longer in operation; (3) statements on Schedule I that Defendant had no income at time; (4) statements relating to CARS' ownership of the Caldwell Property and the DA Capital loan; (5) Defendant's testimony at trial relating to the DA Capital loan; and (6) Defendant's trial testimony that Zimel had signed the DoT and that he witnessed her do so.[9]   The Court declines to find

---

[8] For what it is worth, the Court notes that neither the chapter 7 trustee in Defendant's bankruptcy case, nor the U.S. Trustee, has sought on this ground, nor on any other grounds, to deny Defendant a discharge.

[9] Defendant again, points out that most of these allegations were raised for the first time in Plaintiff's post-trial brief, including Plaintiff's complaints about Defendant's testimony at trial concerning the alleged forgery of Zimel's signature on the DoT. Given Rule 4004(a)'s deadline for raising objections to discharge, and Plaintiff's lack of any attempt to seek to amend its complaint to conform to the proof at trial under Rule 7015 or Civil Rule 15(b), it is inappropriate, and prejudicial to Defendant, for Plaintiff to rely upon Defedant's trial testimony as a basis to deny discharge.  But, again, since Plaintiff's proof on the merits fails, the Court will not rely upon Plaintiff's questionable tactics to deny relief.  *See* Rule 1001 (requiring that the Rules be construed to secure a just, speedy and inexpensive determination of the issues).

that these statements, even if made by Defendant, and are false, justify denial of

discharge under these facts.

### 1.    The Bankruptcy Schedules and Statements

#### a.    Arguments

Plaintiff contends that Defendant's responses to questions in the

bankruptcy schedules and related statements indicating that CARS had no assets

constitutes false oaths justifying denial of discharge under § 727(a)(4).  As to

Defendant's representation that CARS had no assets, Plaintiff asserts that, at the

time, CARS retained a leasehold interest in the Fairview Property and, on the

date the bankruptcy case was commenced, owned the Caldwell Property.  In

response, Defendant argues that he never held any cognizable interest in the

Fairview Property as the lease was always in his parents' name.  Defendant

acknowledges that while it was his parents' intent that he be the "successor" to

their lessee interest in the Fairview Property, because the lease was never

assigned in writing to Defendant, nor approved by the lessors, something the

lease required be done to make any assignment effective, he was not required to

disclose any interest in the Fairview Property in his bankruptcy filings.

Next, Plaintiff argues that because CARS was still the record owner of the

Caldwell Property on July 31, 2019 when the bankruptcy petition and schedules

were filed, Defendant's statements on Schedule A/B and Schedule E/F that CARS had no assets and no longer owned the Caldwell Property were false oaths for purposes of § 727(a)(4).   Defendant admits, as he must, that the quitclaim deed transferring the Caldwell Property to DA Capital was not signed and recorded until the day after Defendant's bankruptcy petition was filed.   However, he insists there was no equity in the property above liens and that it was his intent to have made the transfer before bankruptcy, but through inadvertence, did not get this accomplished.   Defendant also reminds the Court that, when he and his attorney became aware of the timing of the CARS transfer to DA Capital, that he promptly amended the schedules and disclosed the details of the transfer to the case trustee.

Next, Plaintiff targets Defendant's statement in the bankruptcy schedules that CARS was no longer operational and that Defendant had no income.   To show these statements were false oaths, Plaintiff points to testimony that CARS had $20,000 in revenues in July 2019, and that $30,000 came through Defendant's bank account between January and July 2019.  Defendant contends that Plaintiff has not shown why these statements were material or made fraudulently. Defendant notes that Plaintiff did not question Defendant at trial in any

meaningful way about the source of these funds.  Further, Defendant claims it was his understanding, while likely erroneous, that because he was not employed at the time he filed his petition, he did not have "income."

Finally, Plaintiff alleges that Defendant made a false oath in response to Question #18 in the statement of financial affairs because he failed to list either the DoT or the quitclaim deed on the Caldwell property to DA Capital as transfers occurring within two years prior to filing bankruptcy.  Defendant reminds the Court that the Caldwell Property was owned by CARS, not Defendant.  He also reminds the Court that the DoT was disclosed in the bankruptcy schedules because it encumbered the Eagle Residence, and that because it was signed on May 25, 2017, outside the two-year period referenced in SOFA Question #18, he did not need to include it in his answer to that question.

### b.    Analysis and Disposition

In the Court's view, while Plaintiff's criticisms of Defendant's efforts to candidly and completely complete the bankruptcy schedules and related statements are, in some respects, valid ones, the record is inadequate to show that any of the alleged false oaths made by Defendant were, as a matter of disputed fact, material and fraudulent—requirements for discharge denial under § 727(a)(4).

First, some of the representations Plaintiff assails, such as those regarding the

DA Capital transactions, were, technically, in fact correct.  As discussed above,

the DoT transfers occurred more than two years before bankruptcy.  The DoT

was properly listed as a secured debt in the schedules for the Eagle Residence,

and the lien on the Caldwell Property did not need to be disclosed because it was

not a transfer by Defendant of his property, as opposed to CARS' property.

Next, the Court concludes that Defendant's failure to make full disclosure

concerning his CARS interests and its current operations, while perhaps ill-

advised and incomplete, was not material in this case since CARS was essentially

defunct.  Any "income" to Defendant from selling used cars immediately before

the bankruptcy filing was minimal, and any value attributable to Defendant's

interest in CARS negligible in light of its lack of assets and overwhelming debt.

Moreover, in the Court's view, Defendant's effort to amend the schedules

where they were indeed erroneous to disclose accurate and additional

information to the case trustee, and his production of records to evidence his

income and business dealings, tend to negate any finding of fraudulent intent.

All things considered, while obviously not a good model for others, Defendant's

schedules do not sufficiently evidence that Defendant's bankruptcy filings were

intended to lie, cheat or injure creditors, court officers or the bankruptcy process. Simply put,  the errors or inadequacies in Defendant's schedules or statements in this case have not been shown to be sufficiently offensive to deny Defendant bankruptcy relief.

### 2.   Statements at Trial

#### a.   Arguments

Plaintiff also insists that Defendant made false oaths during his testimony at trial concerning the DA Capital loan details and about whether his ex-wife, Suzann Zimel, signed the DoT.  More precisely, Plaintiff argues that Defendant's testimony that there was no new cash advanced to CARS via the DA Capital loan, and that the loan was intended to be used to pay off the flooring lines from Brasher's Idaho Auto Action, were false.

Defendant responds by noting that he did, later in his testimony, clarify his understanding of the terms of the DA Capital loan.  In any event, he also argues the statements Plaintiff targets were not material nor made fraudulently.

Plaintiff contends that Defendant also made a false oath when he testified that his ex-wife, Suzann Zimel, signed the DoT and that he was in the room when she signed it.  At trial, Zimel testified that she did not sign the DoT and that the signature appearing on the document introduced in evidence was not

hers. Sticking to his guns on this point, Defendant argues that Zimel is not a

credible witness because, among other things, she suffers from memory issues

relating to her medication and alcohol use during 2017 when the DoT was

signed.

### b.    Analysis and Disposition

While the trial evidence is contested and, in some respects, contradictory,

the Court declines to find as a matter of disputed fact that Defendant made

knowing and intentionally false oaths during his testimony at trial.

The evidence showed that, as part of the loan transaction, DA Captial

advanced funds to CARS to pay off certain existing CARS lines of credit with

other creditors, and for operating needs of the business. Those funds and

payoffs were facilitated through deposits into and transfers from the CARS bank

accounts. Therefore, Defendant was incorrect to testify that DA Capital was

advancing no new "cash" and he erred in his account of how the funds were

used. But, to the Court, Defendant's testimony, if even incorrect, was not

intended to mislead or defraud creditors or the Court. The testimony disclosed

that because the DA Capital funds were used for the most part to pay off existing

debts and that CARS did not receive substantial other monies. In this respect,

then, Defendant perceived that CARS did not get "new" cash. But assuming this

is an incorrect description of the transaction, it was at worst wrong, not nefarious in the Court's opinion.  There is no evidence that Defendant was attempting to hide or skew the details of the transaction even if he was inept in accurately talking about its terms.

Defendant's account of the execution of the DoT, and his insistence that Zimel indeed signed the document in his presence is more problematic.  Zimel insisted that she was unaware of the existence of the DoT until after the bankruptcy was filed.  Both witnesses cannot be correct.

At bottom, the Court finds the evidence inconclusive on this issue.  On this record, the Court could find that Defendant was intent on doing the DA Capital deal without involvement of his spouse, perhaps attributable to the personal and marital problems the parties were experiencing at the time.[10]  This may have motivated him to orchestrate an attempted grant of a lien on the Eagle Residence without Zimel's participation or even her knowledge.  If so, Defendant's trial

---

[10]  The Court heard considerable testimony about the trauma and tribulations experienced by this family and their relationships during the relevant times.  Defendant was under pressure resulting from the collapse of a long-standing family business under his leadership.  Ms. Zimel was experiencing health and wellness issues. The parties were obviously involved in a passionate dispute about their situation and futures.  The evidence suggests that under these circumstances neither Defendant or Zimel were acting cogently or with the others' interests in mind.

MEMORANDUM OF DECISION - 33

testimony was false.  On the other hand, the Court could also find on this

evidence that, since Zimel's signature was notarized, and because of her

apparent medical and mental condition and the parties' domestic disputes that,

while she may not now recall it, she in fact signed the document, and her trial

testimony should be discounted.

Given the importance of a resolution of this action, the Court is not

persuaded to find that Defendant's testimony under oath, even if false, was

intended to deceive.   Given this record in this context the Court is reluctant to

base a denial of discharge on the disparity in the witness' testimony.

Accordingly, the Court declines to deny Defendant a discharge for a false oath on

this basis.[11]

### *Conclusion*

This action involves challenging factual and other issues.  The Court's

determinations were complicated by the parties' and witness' history and

relationships and possible motivations.  After careful consideration of the

conflicting evidence in the record, and despite Plaintiff's arguments to the

---

[11]  The Court's decision to forego more definitive fact-finding on the issue of Zimel's
signature on the DoT is without prejudice to whatever arguments could be made about that
issue in a different setting, for example, any action by a trustee concerning the validity of the
lien granted by the DoT on the Eagle Residence to DA Capital.

MEMORANDUM OF DECISION - 34

contrary, the Court concludes that Plaintiff has not carried its burden of proving

that Defendant should be denied a discharge under § 727(a).  A separate

judgment in favor of Defendant dismissing this action will be entered.

DATED: April 12, 2022

Jim D. Pappas

U.S. Bankruptcy Judge

MEMORANDUM OF DECISION - 35